May it please the Court, I'm Ken Cudon, and I represent Automotive Gold. If you could keep your voice up, please. Okay, I'll step a little bit further up. I intend to devote my time this morning to the first sale doctrine and its application to the facts of this case. With respect to the latches issue, we will rest on our brief unless the Court has questions or unless our adversaries decide to make it a big point. Okay. The central issue from our perspective in this case is whether Automotive Gold's sale, under its own brand name and disclaimers, of a decorative license plate bearing genuine Volkswagen medallions, has presented triable issues under the first sale doctrine as to whether our representations of the product were accurate. We are here because the district court granted summary judgment to the defendant, Volkswagen of America. The district court rejected our first sale defense as a matter of law. In granting summary judgment, the Court alluded to the confusion findings that this Court made in the earlier aesthetic functionality decision. We contend that the findings that the Court made with respect to the aesthetic functionality issue are inapposite in this context. And the reason that we contend that begins with the Court's first statement in the aesthetic functionality opinion. The question is whether the Lanham Act prevents a maker of automobile accessories from selling, without authorizations, products bearing exact replicas of the trademarks of these famous car companies. Throughout the opinion, the Court refers to the exact replicas and exact copies in its related, in its discussion of aesthetic functionality and in its related discussion of confusion. Now, if we are, if we agree with you and conclude that the opinion the first time around in this Court, that the confusion finding, which is fairly, you know, it's a fairly extensive discussion, is confined only to those articles where there's a replica, rather than something that has been purchased, what is to prevent us from looking at precisely the same factors that the Court of Appeals looked at before and coming to precisely the same conclusion with respect to confusion? I think the major thing that would prevent you from looking to those same factors is that the Court relied heavily on the fact that they were exact replicas in making its decision with respect to the disclaimers, for just one example. It seems to us, Your Honor, that when the Court discussed the disclaimers, it took a very dim view of them. But in the first sale context, this Court, on other occasions, has taken a very strong view that you need disclaimers if you're using a genuine product. Okay. Let me ask you another question that kind of cuts the other way on this issue as to what the panel did the first time around. That discussion of possibility of confusion, particularly post-purchase confusion, by the Court the first time around, is framed by the defense of first sale is not yet in front of us because not decided before. So it seems to me that the Court, in discussing confusion, precisely had in mind first sale. But it was going to get rid of the confusion question, take that off the table. But the only piece of the case that involved the first sale defense is the non-replica. Well, I agree with you, but I don't think that the factors, in other words, under normal circumstances, and this was not a normal circumstance, and under normal circumstance, there would be findings of fact by the district court, and the district court would go through the various factors of confusion and make a decision, or the trier of fact would do so. In this case, what happened was, because the aesthetic functionality issue was decided by the district court on a truncated record, I shouldn't say a truncated record, the record was full, but he did not rely on the various confusion factors that are normally relied on under Sleekcraft, so what you had was the Court making a decision, it seems to me, this Court making a decision, it seems to us, based on the primary factor that these were replicas. They weren't the real thing. And it seems to us that why would they have remanded it on the first sale doctrine if, in fact, all these decisions had already been made? Let me ask you this way. Assume, and I'm not asking you to concede, because you don't want to concede and I'm not going to ask you to concede. Assume that there is a high likelihood of post-purchase confusion, and I'm now looking at not the replicas, but I'm looking at the actual medallion that has been purchased from Volkswagen. If there is post-sale confusion with respect to these license plates or these sort of what would go in the place of a license plate that has the medallion, has there been a – assuming high likelihood of confusion, is there a trademark violation? If there were a high likelihood of confusion, I'm not going to concede that there would be, and here's the reason why. Yeah, okay. And I think this is the most important element of this post-purchase confusion issue. When the Court has made decisions previously involving post-sale confusion, there has always been a high risk of injury to reputation or goodwill. In this case, there is none. For example, in the Storrs – Carl Storrs case, which is probably the best example of it – the Court looked at the endoscopes that were involved and said, wait a minute, the people who buy the endoscopes, the purchasers of the endoscopes, really don't have anything to do with the endoscope itself. The surgeons have something to do with that, and the surgeons are confused. They have indicated, as a matter of fact, that they're confused as to whether these are the original Storrs endoscopes or whether they are inferior rebuilds that have been made by the defendants. What about the Rolex line of cases, though? Okay, so somebody takes the Rolex case, so it looks like a Rolex, but they're all – Rolexes don't work anymore. They put in replacement parts. The purchaser knows darn well that he's not purchasing a Rolex watch, but of course he wants to wear one on his wrist because it looks like he either is rich or was rich before he paid for the watch. Nobody's – where's the harm? Because I understand that the endoscope question, the harm may be to the surgeon and then to the patient because the thing is of inferior quality. But wearing, as it were, the kind of fake Rolex watch, the only harm is to Rolex that maybe somebody is able to get away with the cachet of a Rolex watch without paying for it. But the person who has the watch is not harmed. He knows exactly what he got. And the people around him who see the Rolex watch, it's hard to say that they're harmed except that they have been impressed by the fact that he's got a Rolex watch. So that's the line of case that's, I think, harder for you. I agree, Your Honor, that it's harder, but I think that there is an underlying problem in Rolex that is not present here, and I'll explain what I think it is. Rolex, first of all, is a very expensive timepiece. And it's expensive because it is a finely made timepiece. What was going on in the Rolex case is that somebody, the defendant in the case, was putting in parts in that Rolex that were generic. They were not Rolex parts. Sure. And as a consequence, the product really was not a Rolex in any sense of the word. And there really was a risk of damage to their reputation because, just for example, I've got a watch, it's not a Rolex, but I have a watch that I can take underwater. One of the facts that they cited in that case is that by putting on a new face or bezel or whatever it's called, that it might destroy the waterproofing of the watch. Well, you know, that is a reputation-damaging, at least prospectively, reputation-damaging set of facts that are not present here. I mean, this is a case of ---- Was putting in Rolex premised upon confusion of the purchaser, or was it premised upon post-purchase confusion of others? I think it was actually of everyone, that there was ---- in other words, as I remember the facts of the case, there was a concern for the latent problem of parts that really weren't Rolex parts, so that would affect the purchaser. Right. And then there was the more general problem of prospective injury to reputation because the watch really wasn't a Rolex watch. The other thing about that is that these are, both Storrs and Rolex, are cases that involve refurbishments as opposed to new products. In this case, we have basically a product that consists of a piece of metal and a genuine Volkswagen medallion attached through a manufacturing process to that piece of metal. It seems to me, and, you know, I just can only go by common sense on this, that there is no fear. It's an academic fear of damage to the reputation or goodwill of Volkswagen. What really is at stake here, it seems to me, is that Volkswagen doesn't want the competition. And the cases that we have cited focus directly on that factor, on the public interest in competition that is created by being able to take a component that is a trademark component and put it onto another product to create a new product that competes against the product of the trademark holder. The Rojo case, the Benzel case are exactly that, and I think that they are exactly the case that we have here. So it seems to me that with regard to post-purchase confusion, one of the issues that you haven't raised is, well, how do we know that there is post-purchase confusion in this case? And that is another of the factors that the various cases that we have cited brings out, that there is no finding in this case, at least not a finding by a trier of fact, and there's no evidence that's been presented by Volkswagen that somebody who sees that plate with a Volkswagen medallion on it is going to automatically assume that it was sourced from Volkswagen. Yes, they may assume, and I would expect them to assume, that the logo itself was sourced from Volkswagen, but there's no evidence in this case that the plate itself was sourced from Volkswagen. And that, it seems to me, is a defect in the proofs in this case that we really need to see, because we're talking about not a – not an item that consumers normally would expect to purchase from an automobile manufacturer. I mean, if you take the example that was given by the defendants of a motorcycle, a motorcycle is a highly engineered piece of equipment that is considered a motor vehicle. If somebody sticks a genuine Volkswagen medallion on a motorcycle, yes, you're going to pretty well have to assume that that came from Volkswagen. Same thing if you're dealing with a brake pad or a brake liner. It's an automotive part. A license plate – How about a, you know, a floor mat that says Volkswagen on it? Am I supposed to assume that comes from Volkswagen? That would be a question of fact for a jury. I think that you would have to have a survey to determine that. Probably not, but somebody might think so. I just don't know. And we're dealing, too, with the replacement market. The replacement market is full of companies that make aftermarket accessories, so it isn't something that I think that you can automatically assume. Certainly, a license plate, which is a novelty item, generally speaking, is not something one would expect to come from an automobile manufacturer, presents a much more difficult case than even a floor mat, which all cars come with. So in our view, that is an issue that really is one for the trier of fact. And I think if you look at the cases that we have cited, the question of fact relating to whether the product itself was sourced by Volkswagen, the post-purchase confusion question, is one that those courts have certainly looked at, perhaps in a different context, but they have made that statement. One of the cases that did so is the case involving Ford with the limousines. Okay. You know, the red light just came on. Let's hear from the other side, but we'll make sure to give you a chance to respond. All right. Thank you. May it please the Court. Gregory Phillips for Volkswagen. This is a replacement medallion. The purpose is if, like this summer, I hit a deer with my Volkswagen, my grill was damaged, I had to get a new medallion and put it on it. According to Automotive Gold, as long as they buy this medallion, they can put it on a license plate frame, they could make wheels for a Volkswagen car, they could make a trailer, they could make a luggage rack. You know, I'd prefer to not they could do, but rather what they did do, and they did it to the license plate. Right. Yeah. But there is no, the point I'm trying to make is there is no logical or principled end to the first sale defense as they've made it. And in this case, Volkswagen doesn't sell this product, and it has absolutely no quality control over this product. Now, he makes the point, well, this is an exact medallion. The Ninth Circuit addressed that in the Westinghouse case and says, said that whether it's the actual trademark itself in the form of a label or a counterfeit is irrelevant. And he said there's no evidence of post-sale confusion. But the Ninth Circuit's already dealt with that issue in the Sleecraft case, which is the famous case that lists all the factors. And one of the factors is that if somebody intentionally takes a trademark and puts it on a product, confusion is presumed. Because anybody, when I would go to a stoplight and I would look and see a vehicle next to me with this license plate on it, I would logically assume that Volkswagen somehow manufactured or sponsored this product. Wait a minute. Your Volkswagen emblem there, you admit that I could go in and buy that now. Yes. Suppose I took it and I put it on a piece of tin or whatever it is and put that in my license plate holder. Do I violate the laws? Probably not, because you're not engaged in commerce. If you did that and then tried to resell it, you would. But, for example, I can take a Harley-Davidson leather jacket and if I want, cut off the Harley-Davidson logo on the back and use it as a seat cover on my Harley-Davidson motorcycle and nobody could do anything. But the minute I cross the line and start trying to sell that in commerce, then I would violate the Lanham Act. Now, the first argument they make is that the quality, Volkswagen shouldn't care because this is a high-quality product. Tonight, the Yankees are playing in the World Series. If somebody goes and makes knock-off Yankee hats that are of higher quality than the actual hats sold by Yankees in Major League Baseball, that's not a defense. And as Judge Duffy may be aware of the El Greco case from the Second Circuit, which is cited by this court in the Westinghouse case, by the Ninth Circuit, in El Greco, what happened is Candy Shoes had a supplier that was making Candy Shoes and Candy Shoes terminated the contract. And the supplier had all this inventory and sold it in the United States. And the defense was, well, these are exactly the same as Candy Shoes. The quality is impeccable. They have no right to complain. And the Second Circuit said that a trademark holder, one of the fundamental rights of a trademark holder is the ability to control the quality of the product. And because Candy Shoes, or Volkswagen in this case, has never been able to control the quality of the product, it doesn't matter how good the product is. Just, you know, the counterfeiter who sold the counterfeit Yankee hat tonight would be laughed out of court if he said, my hat's actually better than the Yankee cap. The other argument they make is that disclaimers solve this problem. And there's two problems with that. Again, using the Yankee example, if somebody tonight at the Yankee game, Yankees World Series game, sold a cap and sewed a disclaimer in there that said, this is not a defense, not endorsed or manufactured by these people, that would not be a defense. Similarly, the Rolex case that you talked about, if somebody is selling a Rolex watch on the street corner and put on the back of it, this is not a real Rolex watch, that would not be a defense. Disclaimers don't work in the post-sale context. And if I'm driving down the road and I see this on a vehicle, there's no way I can tell that it's not genuine. So the disclaimer, in my view, is nothing more than the last refuge of a scoundrel or an infringer. If you let disclaimers save the day, there's no such thing as counterfeiting, because the counterfeiter will always put a disclaimer on that. The other argument that they make is that this is anti-competitive. And again, using the example of the Yankees game tonight. No, I hesitate to interrupt. Do you mind putting it down on the table? I'm finding it distracting. That's all right. Okay. I apologize for that. No, no, no problem. You know, the guy selling the counterfeit Yankees cap tonight, if he gets busted, he can't come into court and say, look, this is pro-competitive. These Yankee fans, they ought to have an alternative. They shouldn't have to pay 50 bucks for a genuine Yankee cap. Let them buy the $10 knockoff from me. And in fact, this court in the Levi Strauss case, which is cited again by both parties, there's two Levi Strauss cases from the Ninth Circuit, but Levi Strauss won. Wrangler made that argument and said, if you let Levi Strauss enforce its trademark, you're giving them a monopoly in the Levi Strauss trademark. And the Ninth Circuit said, Wrangler's pejorative use of the term monopoly implies that Strauss's trademark right is harmful and anti-competitive. On the contrary, the pocket tab trademark gives the public a reliable indication of source and thus facilitates responsible marketplace competition. And one of the arguments we made before the previous panel was Automotive Gold, they could make one of these license plate frames or license plates and they could put the Automotive Gold logo on it instead of a VW logo on it. And Automotive Gold's response was, well, if we did that, nobody would buy it. And Judge McKean in footnote 9 said, rejected that argument and said, that argument is just another way of saying if I can't trade on your trademark, I can't compete. And going back to where I began, the fundamental issue that I think this case presents is whether a trademark holder has the right to control what products its trademarks appear on. And in this case, Volkswagen has the right, because it owns the trademark rights, to determine whether its replacement hood medallion should appear on a medallion license, a medallion license plate, just as if they were making a motorcycle or an airplane. How do you respond to the argument that we should read our cases in post-purchase confusion, post-purchase confusion cases as finding trademark infringement only when there is harm to the reputation of the trademark holder? Well, I don't think that's what the cases say, when there's only harm to the trademark holder. Reputation or harm. Right. But for example, you mentioned the Ford floor mats. There's a case that we argued, we both argued to the previous panel, Ford versus Lloyd, it was Ford Motor Company versus Lloyd Design. It was an Eastern District of Michigan case that went to the Sixth Circuit. And what happened in that case is Lloyd Design actually had better floor mats than Ford's floor mats. And the district court judge on the preliminary injunction said, oh, let me look at those floor mats. Ford, how can you complain? These are great. I would be proud to have these in my car. And Judge Roberts, who took the case over from that original judge after it got remanded from the Sixth Circuit, cited the El Greco case from the Second Circuit and said, it doesn't matter, under the trademark laws, it doesn't matter how good the product is, because as Judge Berry said in the footnote that we cited in our brief from the Porsche case, from the liquid last case, what she said, and I think this is very important, she said, the Porsche trademark is its authentic seal. By it, Porsche vouches for the goods which bear it. If another uses it, he borrows the owner's reputation, whose quality no longer lies in his control. This is an injury, even though the borrower does not tarnish it or divert any sales. And you see, I'm inclined to agree with you, but not so much on the ability to control quality, so much as on the ability to control sales and decide how to make a profit from the trademark. Okay. Well, let's assume that this medallion or this license plate frame is really horrible, that it's rusted, that they've used some really bad paint on it, and it starts rusting. According to them, as long as I have the medallion, I can do whatever I want. But then if somebody sees that out at the stoplight and sees the rust on it, looking at it will say, boy, Volkswagen, their quality has really gone downhill. Look at that horrible license plate that they're selling. It's all rusted out. If they can't make a license plate right, why would I ever buy a Volkswagen Tarig or a Volkswagen car? And again, that goes back to my fundamental point that a trademark holder has to have the right to control the products that go out under its trademark. Well, I understand that, but in a sense, this is not an argument against you. I'm just trying to figure out what the best rationale here is. I don't know that the rationale has to be restricted to the ability of the trademark holder to control quality. It could be that I think it might be sufficient that the holder of the trademark has the ability to decide how to profit from the trademark. Correct, absolutely. And that's one of the fundamental rights of a trademark holder, is to be able to profit from all the goodwill that you've spent millions of dollars for the last 50 years building in your trademark. And in further response to your question, I mean, if they use these medallions to make wheels for Volkswagen vehicles that raise safety concerns because they were cheap wheels imported from China or something, according to them, as long as they buy the medallion from a dealer, they have every right to put them on a wheel. And that would definitely harm Volkswagen. So I don't think you can limit the harm to Volkswagen just in the context of the license plate. You have to look at it in the context of the ability of the trademark holder in general to control what products they are on. For example, if they wanted to start making airplanes and putting that on it, and Volkswagen said, we don't ever want to be in the airplane business, according to automotive gold under the first sale defense, they can do that. And again, that's why I go back. And the only other thing I want to mention is they also make this argument about, well, Volkswagen ought to be happy because we're getting free advertising for this. And again, the guy tonight selling the counterfeit Yankee cap, his defense is going to be, well, the Yankees ought to be really happy because now instead of 100 people wearing Yankee caps, you're going to have 150 because 50 of them bought my cheap knockoff, and that's free advertising for the Yankees. And in every situation that they raise that issue, if you just think of the guy selling the Yankee hat tonight at the game, it will undercut their argument in every situation. And unless the court has any further questions, I think I've addressed all of the arguments that automotive gold has made. Mr. Phelous, my only regret is that you didn't think of the Phillies as having a Phillies cap. Well, actually, I'm a Phillies fan, but I knew Judge Duffy was from New York, and I don't know if he's a Yankee fan or not. But I'm now, by virtuous of a son-in-law, I'm a Phillies fan. Well, I guess as long as we're pitching in. I couldn't care less about the Phillies, but I hate the Yankees. Thank you. It doesn't bother me one way or the other. Now, you ran up to and a little bit over. Would you like one minute to respond? I would like one minute. First of all, the Yankee hat example is not a good example because he's talking about counterfeits. And everything that he is talking about and all the cases that he cited so far are in the context of aesthetic functionality. The Ford case was an aesthetic functionality case. It was not a case involving a genuine product. And the other point that he made that I'd like to respond to is the quality control issue. The quality control issue, in every case that I've read in the trademark field involving it, and particularly in the Second Circuit, there has been a requirement that there be evidence that the one party is not providing the quality control that the other party is. And there is no evidence of that in this case. In fact, Volkswagen has conceded that our products are of good quality. I think that what we have to look back to is the first sale doctrine. Does the first sale doctrine allow us to provide this product with the appropriate disclaimers that we have and with the brand name Automotive Gold on it? And the short answer is that every case we have cited indicates that it is permissible and we think it raises a triable question of fact for the jury. Thank you. Okay, thank you very much. Thank both sides for their helpful arguments. The case of Automotive Gold v. Volkswagen is now submitted for decision.
judges: Duffy, Noonan, Fletcher W.